EDWARD W. MILLER
Attorney for Plaintiffs
575 Lexington Avenue, Suite 2840
New York, N.Y.  10022
Telephone: (212) 758-1625

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

**MARISOL LAUREANO,** Individually as the
Sister of the decedent and as Administratrix
of the estate of **SILVERIO DELRIOS,**
deceased, and **OLGA DELRIOS,** Mother of
the decedent and **VENUS RIVERA,**
Sister of the decedent and **ANGELA BRICE,**
Individually and as Administratrix of the estate of
**ROBERTO MURRAY,** and brother of the
Decedent.



**06 CV 7845**

                     Plaintiffs                          **COMPLAINT**

          v.

**GLENN S. GOORD,** Commissioner of the
New York State Department of Correctional Services
("DOCS"), **LESTER WRIGHT,** Deputy Commissioner
and Chief Medical Officer of DOCS, **RICHARD
MIRAGLIA,** Associate Commissioner Division of
Forensic Services of OMH, **MARY JOHN HOPKINS,**
DOCS Medical Director at Elmira Correctional Facility,
**PETER RUSSELL** Chief of OMH services at Elmira
Correctional Facility, **HELENE TOMBERELLI,**
**MARK R. STAWASZ, DR. JONATHAN KAPLAN,**
**MABATHO MATIMA,** Corrections Officers Tamar,
Harrsch and Fink and **JAMES/JANE DOES 1 – 13,**
**DALE ARTUS,** Superintendent of Clinton Correctional
Facility,

**JURY TRIAL
DEMANDED**



                     Defendants
-----------------------------------------------------------x

### Preliminary Statement

1.     Plaintiffs Silverio Delrios and Roberto Murray were severely mentally ill

New York State prison inmates who died because defendants acted with deliberate

indifference to their serious mental and medical health needs.  Defendants failed to provide basic and desperately needed psychiatric and medical treatment and medicine in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Plaintiffs bring this action under 42 U.S.C. § 1983, and the Eighth and Fourteenth Amendments of the United States Constitution.

### Jurisdiction and Venue

2.      This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343.  Venue is proper in this district under 28 U.S.C. §1391(b).  A substantial part of the events or omissions giving rise to the claim occurred in the Southern District of New York at Downstate Correctional Facility ("CF" herein) in Fishkill, New York, plaintiffs' estates are domiciled in the Southern District of New York and a number of the defendants maintain offices and residences in the Southern District of New York.

### Parties

3.      Plaintiff Silverio Delrios (30 years old) entered the New York States Department of Correctional Services ("DOCS," herein) prison system at Downstate CF on or about June, 2003 from where he was transferred to Elmira CF on September 29, 2003.  He committed suicide there nine days later on October 8, 2003. (The Estate parties will be referred to simply by the name of the decedent throughout the complaint).

4.      Plaintiff Roberto Murray (19 years old) entered the DOCS prison system at Elmira CF on November 30, 2004 from where he was transferred to Clinton CF on January 21, 2005.  During the following half year plaintiff Murray was transferred between several correctional facilities for court appearance purposes and was involuntarily hospitalized on April 25, 2005 for active suicidal behavior and statements.

Plaintiff's final transfer back to Clinton CF was on August 1, 2005.  He committed suicide there a week later on August 8, 2005.

     5.     Defendant Glenn S. Goord is and was at all times relevant to this complaint (all allegations in this complaint, whether stated in the past tense or present tense, are directed at all times relevant to this complaint) the Commissioner of the New York State Department of Correctional Services ("DOCS").

     6.     Defendant Lester Wright was the Deputy Commissioner and Chief Medical Officer of DOCS.

     7.     Defendant Richard Miraglia was the Associate Commissioner Division of Forensic Services of the New York Office of Mental Health ("OMH").

     8.     Defendants Goord, Wright and Miraglia (collectively referred to as **"DEFENDANT STATE POLICY MAKERS"** herein) were jointly responsible under New York Correction Law Section 401 for providing mental health care to New York State prison inmates, including maintaining proper staffing levels and establishing and enforcing policies, programs and provisions necessary to insure the effective delivery of psychiatric care to New York State prison inmates in need thereof.

     9.     Defendant James/Jane Doe 1 was the DOCS Medical Director at Downstate CF.

     10.     Defendant James/Jane Doe 2 was the OMH Unit Chief at Downstate CF and together with James/Jane Doe 1 (collectively referred to as the **"DOWNSTATE SUPERVISORY DEFENDANTS"** herein) was responsible for the provision of psychiatric care to mentally ill prisoners incarcerated in that prison.

11.     James/Jane Does 3, 4, 5 and 6 were, respectively, an OMH psychiatrist responsible for providing individual mental health care for inmates at Downstate CF including plaintiff Delrios by assessing their psychiatric and psychotropic medication needs, prescribing medication, developing and implementing psychiatric treatment plans and providing psychiatric treatment, an OMH psychologist, and two other OMH workers responsible for delivering mental health care to inmates at Downstate CF including plaintiff Delrios.

12.     Defendant **Mary John Hopkins** was the DOCS Medical Director at Elmira CF.

13.     Defendant **Peter Russell** was the OMH Unit Chief at Elmira CF and together with Defendant Hopkins (collectively referred to as the "**ELMIRA SUPERVISORY DEFENDANTS**" herein) was responsible for the provision of psychiatric care to mentally ill prisoners incarcerated there.

14.     Defendant **James/Jane Doe 7** was an OMH psychiatrist responsible for providing individual mental health care for inmates at Elmira CF including plaintiff Delrios and/or Murray by assessing their psychiatric and psychotropic medication needs, prescribing medication, developing and implementing psychiatric treatment plans and providing psychiatric treatment.

15.     Defendant **James/Jane Doe 8** was an OMH psychologist responsible for providing individual mental health care for inmates at Elmira CF including plaintiff Delrios and/or Murray.

4

16.     Defendant **James/Jane Doe 9** spoke with plaintiff Delrios on October 7, 2003 and observing obvious signs of severe mental illness and decompensation, made an immediate referral to OMH.

17.     Upon information and belief, defendant **James/Jane Doe 10** was the OMH employee whose duty it was to respond to **James/Jane Doe 9**'s referral of plaintiff Delrios to OMH for OMH services.

18.     Defendant **Helene Tomberelli** was a nurse practitioner working for OMH at Elmira Correctional Facility who on December 8, 2004 conducted a medication assessment of plaintiff Murray to determine his need or lack thereof for psychotropic medications.

19.     Defendant **Mark R. Stawasz** was an OMH social worker responsible for providing mental health care for inmates at Elmira CF, including plaintiff Murray. (Defendants James/Jane Does 7, 8, 9, 10, Tomberelli and Stawasz are collectively referred to as the "**ELMIRA STAFF DEFENDANTS**," herein)

20.     Defendant **James/Jane Doe 11** was the DOCS Medical Director at Clinton CF.

21.     Defendant **James/Jane Doe 12** was the OMH Unit Chief at Clinton CF and together with James/Jane Doe 11 (collectively referred to as the "**CLINTON SUPERVISORY DEFENDANTS**" herein) was responsible for the provision of psychiatric care to mentally ill prisoners incarcerated in that prison.

22.     Upon information and belief, defendant **Dr. Jonathan Kaplan** was an OMH psychiatrist responsible for providing individual mental health care for inmates at Clinton CF including plaintiff Murray by assessing their psychiatric and psychotropic

medication needs, prescribing medication, developing and implementing psychiatric treatment plans and providing psychiatric treatment.

23.    Defendant **Dr. James/Jane Doe 13** was an OMH psychologist responsible for providing individual mental health care for inmates at Clinton CF including plaintiff.

24.    Defendant **Mabatho Matima** was an OMH social worker responsible for providing mental health care for inmates at Clinton CF, including plaintiff Murray. (Defendants Kaplan, Matima and James/Jane Doe 13 are collectively referred to as the **"CLINTON STAFF DEFENDANTS,"** herein)

25.    Defendant correctional officers Tamer, Dennis B. Harrsch and Fink were three corrections officers who first reported to plaintiff Murray's cell after plaintiff Murray committed suicide on August 8, 2005.

26.    **DALE ARTUS** was Superintendent of Clinton Correctional.

27.    At all times referred to herein, defendants were state actors and acted under color of the laws, statutes and ordinances, regulations, policies, customs and usages of the state of New York.  They are sued in their official capacities.

**Facts**

28.    Plaintiffs **SILVERIO DELRIOS** and **ROBERTO MURRAY** both suffered from serious mental illness for which they were each, prior to their incarcerations: (a) determined to be "disabled" by the United States Social Security Administration, (b) repeatedly diagnosed with a serious mental illness and hospitalized or institutionalized and (c) under the care of psychiatrists who prescribed and treated them with psychotropic medication to which they responded well over long periods of time.

6

29.     During their incarceration at NY DOCS plaintiffs did not receive their psychotropic medicine and the basic psychiatric care appropriate to their known serious mental illness.  Basic treatment should have included all of the following, but included none: (a) review of psychotropic medications history and assessment of present medications needs by a psychiatrist licensed to prescribe medications, followed by medications monitoring and adjustment, (b) therapy designed to keep the patient compliant with the medications regimen, (c) formulation and execution of a coherent individualized mental health treatment plan, and (d) mental health verbal therapy on a regular basis.

30.     Both plaintiffs were not seen by OMH after their transfers into correctional facilities.  Plaintiff Delrios was transferred to general population at Elmira CF on September 29, 2003.  Although he was designated as being at the highest priority level of need for psychiatric medical care (OMH Level 1), plaintiff Delrios was not seen or treated by OMH staff at Elmira and died on October 8, 2003.  Plaintiff Murray was transferred to Clinton CF on August 1, 2005.  Despite his designation as an OMH Level 1 and his prior suicidality while out to court, he was not seen or treated by OMH staff at Clinton and died just over a week later on August 8, 2005.

### Deliberate Indifference to the Mental Health and Safety of Silverio Delrios

31.     Plaintiff Delrios was hospitalized at New York Office of Mental Health ("OMH") facilities including the Manhattan Psychiatric Hospital and Rockland Psychiatric Center in approximately 2001-2002.  At these OMH facilities he was diagnosed with a serious mental illness and he was prescribed and treated with psychotropic medication including Geodon and Depakote, to which he responded well.

32.    Plaintiff Delrios was incarcerated on or about May 3, 2003 at Downstate CF. At Downstate, psychiatric records established his lengthy history of serious mental illness and Plaintiff Delrios was diagnosed by OMH at Downstate with severe mental illness and designated as OMH Level 1.

33.    OMH Level 1 is defined as indicating "medication monitoring by psychiatric nurse," "admission to CNYPC," "day treatment program (AVP or ICP)," or "placement in a Satellite Unit bed."

34.    Though designated as an OMH Level 1 in need of psychiatric care, Plaintiff Delrios did not receive appropriate mental health treatments or services. At Downstate CF Plaintiff Delrios did not receive a basic psychiatric assessment or a medications assessment from a doctor licensed to prescribe medications. Plaintiff Delrios was diagnosed with a serious mental illness but was not prescribed the medications he needed. Although OMH staff at Downstate had knowledge of his extensive psychiatric history, prior diagnoses, and prior medications, he was left undedicated with no efforts to help him return to a medications regimen. No psychiatrist participated in this abrupt termination of Plaintiff Delrios' medication regimen, no assessment was made by qualified mental health staff of the risk posed by this termination, and medication compliance was not a part of a treatment plan for this patient with serious mental illness.

35.    On April 29, 2003, Plaintiff Delrios was transferred to general population at Elmira CF with no psychiatric medications ordered. **DOWNSTATE SUPERVISORY AND STAFF DEFENDANTS** did not follow policy and communicate to the OMH staff at Elmira that this prisoner with serious mental health needs and that his medications had been terminated and that he required attention in order

to become medication compliant.  Rather, Plaintiff Delrios was no longer on his medications, had no medications ordered and his serious mental illness continued to go untreated based on OMH policy that does not require an immediate psychiatric assessment by the receiving facility.

36.    After plaintiff Delrios' transfer to Elmira CF he did not receive a health screening, including review of mental health status, within twenty-four hours of his arrival at the new correctional facility, and plaintiff Delrios was left without any mental health care.  Plaintiff Delrios' mental health further deteriorated and he displayed obvious signs and symptoms of severe depression, agitation and disorientation.

37.    On October 7, 2003, in the face of obvious signs of complete emotional breakdown, a DOCS employee issued a referral for the patient to OMH.  The referral requested immediate intervention in writing as well as via phone with mental health staff. Delrios was not seen by OMH staff as requested

38.    **ELMIRA SUPERVISORY AND STAFF DEFENDANTS** did not respond to the referral.  Plaintiff Delrios was not provided with an emergency mental health assessment, or mental health care or treatment of any kind, from September 29, 2003 up until plaintiff Delrios' death on October 8, 2003.

39.    **ELMIRA SUPERVISORY AND STAFF DEFENDANTS** ignored the referral. **No one from OMH responded to the referral** despite OMH policy requiring that patients referred by DOCS personnel to OMH be seen by OMH the same day; despite plaintiff Delrios presenting symptoms of a seriously decompensating patient suffering from serious mental illness with psychotic features as reported by the referring DOCS employee; despite knowledge of prior suicidality of Plaintiff Delrios; and despite

9

**ELMIRA SUPERVISORY AND STAFF DEFENDANTS'** knowledge that suicide by prisoners with mental illness is a leading cause of inmate death, that there is an increased risk of suicide around the time that a prisoner with serious mental illness transfers into a new prison, and knowledge that the most significant risk factor for suicide is prior suicidality.

40.    **ELMIRA SUPERVISORY AND STAFF DEFENDANTS** did not respond to the referral which clearly signaled an emergency situation.  The patient, Plaintiff Silverio Delrios committed suicide on the following day, October 8, 2003.

Defendants knowingly left the patient in a psychiatric crisis without mental health care.  Defendants' neglect and indifference resulted in the preventable death of the patient.

41.    The **DOWNSTATE SUPERVISORY DEFENDANTS** are responsible for the knowing disregard for plaintiff Delrios' safety displayed by the failure to provide basic psychiatric care for plaintiff Delrios at Downstate CF and the failure to place him on psychotropic medications and to properly identify the severity of his illness to the OMH staff at Elmira CF to which facility plaintiff Delrios was transferred.

42.    The **ELMIRA SUPERVISORY** and **STAFF DEFENDANTS** are responsible for the knowing disregard for plaintiff Delrios' safety displayed by the failure to provide any psychiatric care whatsoever for plaintiff Delrios at Elmira CF and the failure to keep track of and respond to the arrival of severely mentally ill transferees to Elmira CF and for the failure of Elmira OMH to respond to the referral of patient Delrios to OMH made by defendant **James/Jane Doe 7** on October 7, 2003 and **James/Jane Doe**

7 knowingly disregarded the safety of plaintiff Delrios by not making the referral earlier

or in a more urgent fashion.

### Deliberate Indifference to the Mental and Medical Health and
### Safety of Roberto Murray

43.     Plaintiff Roberto Murray was institutionalized for a year and a half (1999-

2000) at Hillside Children's Center, a residential treatment center in Auburn, New York,

where he was diagnosed as suffering from bipolar disorder and treated with psychotropic

medications. The Social Security Administration determined that Plaintiff Murray was

disabled due to bipolar disorder and in January-February, 2004, Plaintiff Murray was

involuntarily hospitalized at the Rochester Psychiatric Center, due to threats of self harm.

44.     Plaintiff Murray was incarcerated in NY DOCS on or about November 30,

2004 at Wende CF and on or about December 6, 2004, he was transferred to Elmira CF.

45.     During the six weeks of his reception/screening at Elmira CF, plaintiff was

diagnosed with severe mental illness and designated as being in the highest priority level

of need for psychiatric medical care, OMH Level 1

46.     Though designated as an OMH Level 1 in need of psychiatric care,

Plaintiff Murray did not receive appropriate mental health treatments or services.

Plaintiff Murray was not seen a single time by a psychiatrist or psychologist during the

eight months of his incarceration.

47.     Plaintiff Murray was transferred from Elmira CF to general population at

Clinton CF on January 21, 2005.

48.     OMH had full knowledge and recorded that Plaintiff Murray was a

diagnosed bipolar with a history of psychiatric hospitalizations and institutionalizations

going back to childhood who had been treated with psychotropic medications in the past

11

and had a history of threats of self harm resulting in involuntary hospitalizations in January-February, 2004 and April, 2005 when he had engaged in active suicidal planning by hoarding medications at the Monroe County Jail.

49.    Despite the above knowledge of plaintiff Murray's long established and recently confirmed suicidal tendencies which were duly noted in plaintiff's OMH record, no effort was made at any time during plaintiff Murray's incarceration to provide plaintiff any psychiatric treatment responsive to his suicidal tendencies.

50.    Although **CLINTON SUPERVISORY AND STAFF DEFENDANTS** were aware of Plaintiff Murray's psychiatric history they did not provide him with appropriate mental health treatments or services.  Behaviors that made it obvious that he presented a pending psychiatric crisis were ignored.  Plaintiff Murray was refusing to present himself for mental health call outs.  He routinely refused to speak for extended periods.  He was involuntarily hospitalized due to hoarding medications while at the Monroe County Jail for a court appearance in April, 2005.  He expressed anger and walked away when a nurse suggested that he needed psychotropic medication on July 12, 2005.

51.    OMH issued a treatment plan on July 12, 2005 calling for visits with a psychiatrist to address Plaintiff Murray's need for psychotropic medication, but nothing was done.  The single psychiatric medication assessment performed on Plaintiff Murray during his incarceration was conducted on December 8, 2004 by defendant Helene Tamberelli who is not licensed to prescribe medications.  Defendant Tamberelli's "medication assessment" consisted of little more than a notation that plaintiff was taking psychotropic medications but stopped and does not want to continue.  This "medical

assessment" contained no analysis of whether or not the patient needed or needs medication or the facts of the patients past history of psychotropic medication administration.

52.     Despite Plaintiff Murray's prior suicidal behavior while out to court, and the known intense anxiety and potential flare up of symptoms caused to mentally ill patients by court appearances and transfers to prisons, **CLINTON SUPERVISORY AND STAFF DEFENDANTS** did not see the patient, let alone provide the patient psychiatric care or any mental health assessment, care or treatment of any kind, after plaintiff returned to Clinton CF on August 1st until his suicide on August 8, 2005.

53.     Defendant correctional officers Tamer, Dennis B. Harrsch and Fink responded to the inmate report that plaintiff had hung himself entered plaintiff Murray's cell, cut him down from the sheet with which he had hung himself and checked for and found a carotid pulse, but did not commence CPR and plaintiff was left to die.

54.     The **CLINTON SUPERVISORY** and **STAFF DEFENDANTS** knowingly left the patient in a medical crisis caused by his serious mental illness without any medical care. Defendants' neglect and indifference to the serious mental health needs of Plaintiff Murray, resulted in the preventable death of the patient.

55.     Defendant correctional officers **Tamer, Dennis B. Harrsch and Fink** knowingly left the patient fighting for his life and rather than applying CPR as they were trained to do in such circumstances, left him to die. Defendants' neglect and indifference to the life and death medical health needs of Plaintiff Murray, resulted in the preventable death of the patient.

56.     The **ELMIRA SUPERVISORY** and **STAFF DEFENDANTS**
knowingly disregarded plaintiff Murray's safety displayed by their failure to provide
basic psychiatric care for plaintiff Murray at Elmira CF and their failure to place him on
psychotropic medications and to properly identify the severity of his illness to the OMH
staff at Clinton CF to which facility plaintiff Murray was transferred.

57.     The **CLINTON SUPERVISORY** and **STAFF DEFENDANTS**
knowingly disregarded plaintiff Murray's safety by their failure to provide basic
psychiatric care for plaintiff Murray at Clinton CF, their failure to keep track of and
respond to the arrival of severely mentally ill transferees to Clinton CF, and their failure
to provide any treatment or therapy in response to plaintiff Murray's consistently
articulated and recently acted upon desire to take his own life.

## Systematic and Supervisory Indifference to the Safety of Mentally Ill Inmates

### Understaffing

58.     It is the duty of **DEFENDANT STATE POLICY MAKERS** to assure
that the New York prison system is staffed with a sufficient number of licensed mental
health care professionals including psychiatrists, psychologists, social workers and
psychiatric nurses as is necessary to provide adequate psychiatric and mental health care
to inmates with serious mental illness.

59.     **DEFENDANT STATE POLICY MAKERS** were aware of numerous
reports from credible New York State corrections and mental health organizations and
experts, including the New York State Commission on Corrections and the Correctional
Association and facts brought to light in litigation, indicating that inmates with serious
mental illness were being denied basic mental health care due to understaffing of

14

psychiatrists, psychologists, social workers and psychiatric nurses in New York State prisons.

60.   **DEFENDANT STATE POLICY MAKERS** were aware that there were too few licensed psychiatrists serving the inmate population of the New York State prison system to provide even minimal required basic necessary psychiatric services to many of the OMH Level 1 inmates in the general prison population and were well aware that in 2003 and 2005, when plaintiffs died, one third of the funded psychiatrist positions for New York State correctional facilities were not filled. **DEFENDANT STATE POLICY MAKERS** acquiesced in the above described conditions.

61.   Both plaintiffs desperately needed, but due to the shortage of psychiatrists did not receive, mental health care consisting of a review of their psychotropic medications histories and assessment of present medications needs by a doctor licensed to prescribe medications and the prescription of psychotropic medication followed by medications monitoring and adjustment.

62.   Due to the severe understaffing of licensed psychiatrists in the New York State prison system, social workers and others routinely played the role of MD by functionally determining whether or not OMH Level 1 inmates such as plaintiffs needed psychotropic medications.

63.   Because social workers and others who routinely conducted medications assessments were not licensed to prescribe medications, they typically passively perpetuated the non-medication of severely mentally ill inmates such as plaintiffs who were in clear and desperate need of medication.

64.     Both plaintiffs desperately needed, but due to the shortage of
psychologists, social workers and psychiatric nurses were denied, necessary mental
health care consisting of (a) medications therapy designed to keep or get the patient
compliant with the medications regimen, (b) medications monitoring, (c) formulation and
execution of a coherent individualized treatment plan, and (d) mental health verbal
therapy on a regular basis.

65.     As a result of the shortage of appropriate mental health care professionals
to treat inmates with serious mental illness in the prison population, plaintiffs were left
without medically necessary psychotropic medication and the mental health therapy
necessary for patients with serious mental illness to become and remain compliant with
psychotropic medications regimen.  Instead, plaintiffs were left to descend into the hell of
unmedicated severe mental illness and died as a result.

**Illegal and Dangerous Policies**

66.     **DEFENDANT STATE POLICY MAKERS** and the **ELMIRA,
CLINTON and DOWNSTATE SUPERVISORY DEFENDANTS** knowingly
permitted persons not licensed to prescribe psychotropic medication to conduct
medication assessments of severely mentally ill inmates and effectively determine
whether or not those inmates, including plaintiffs, would receive medication for their
illnesses, all in violation of New York State Education Law licensing requirements.

67.     **DEFENDANT STATE POLICY MAKERS** and the **ELMIRA,
CLINTON and DOWNSTATE SUPERVISORY DEFENDANTS** knowingly
permitted lack of continuity of care when inmates were transferred between prisons and
there was no effectively followed practice insuring that the transferring prison would

inform the receiving prison that a seriously mentally ill inmate was being sent to them and no effectively enforced practice or policy of having a nurse or other employee at the receiving facility review charts of arriving inmates in order to identify inmates who are seriously mentally ill in order to bring such information to the attention of the OMH at the receiving facility.

68.     **DEFENDANT STATE POLICY MAKERS** and the **ELMIRA, CLINTON and DOWNSTATE SUPERVISORY DEFENDANTS** permit correctional officers to refrain from giving CPR when required by policy to do so to save an inmate's life.

### Lack of Discipline or Quality Control or Training

69.     **DEFENDANT STATE POLICY MAKERS** have a duty to create and enforce discipline and quality control to ensure that DOCS and OMH employees follow mental and medical health care policies and that reasonable medical and mental health care are provided to New York State prisoners.

70.     **DEFENDANT STATE POLICY MAKERS** have, with deliberate and callous disregard to the safety of inmates with serious mental illness, failed to create and operate a system that holds DOCS and OMH employees accountable for violations of policies and regulations governing delivery of mental and medical health care for inmates.

71.     The absence of discipline of OMH and DOCS employees who violate mental health policies, even when such violations resulted in the death of an inmate, communicated to OMH and DOCS staff that the lives of inmates with serious mental

illness were of little value and that there would be little if any consequence to employees whose negligence caused the loss of such a life.

72.    DOCS or OMH employees throughout the prison system commonly failed to follow rudimentary and important mental and medical health policies as a result of their knowledge that there would be no discipline or accountability for their misconduct.

73.    Under the system of non-accountability operated by the **DEFENDANT STATE POLICY MAKERS** and the **ELMIRA, CLINTON and DOWNSTATE SUPERVISORY DEFENDANTS** the OMH and DOCS staffs at these correctional facilities understood that they were free to violate policies and deny patients mental health care, with no accountability, discipline or resultant negative consequence to themselves.

74.    **DEFENDANT STATE POLICY MAKERS** and the **ELMIRA, CLINTON and DOWNSTATE SUPERVISORY DEFENDANTS** did not hold DOCS or OMH employees accountable for their violations of mental and medical health care policies or their general failure to deliver the patient basic necessary mental health care in connection with the deaths of plaintiffs and in general. Quality assurance and peer review, necessary components of any large scale health care system in order to maintain standards of care and avoid unnecessary suffering, effectively do not exist.

### FIRST CLAIM

75.    Defendants' deliberate individual and collective indifference to plaintiff Silverio Delrios' serious mental illnesses and plaintiffs' obvious need for psychiatric medication and treatment associated with his serious illnesses, under color of state law, violated plaintiff Delrios' rights guaranteed by the Eighth and Fourteenth Amendment of

the United States Constitution to be free from unusual and cruel punishment.and caused

plaintiff Delrios to suffer unbearable mental torture culminating in self inflicted death.

**WHEREFORE,** Plaintiff **SILVERIO DELRIOS** is entitled to amounts of

compensatory and punitive damages in excess of $25,000 to be determined at trial.

### SECOND CLAIM

76.     Defendants' refusals to respond to plaintiff Delrios' known needs for

psychiatric medication and treatment for serious mental disorder in violation of the

Eighth and Fourteenth Amendment of the United States Constitution caused Plaintiff's

family, **MARISOL LAUREANO, SILVERIO DELRIOS, OLGA DELRIOS** and

**VENUS RIVERA,** to suffer the loss of support, services and affection of plaintiff

Delrios along with the emotional pain of having lost a loved one at a young age to an

unnecessary death caused by the indifference of the professionals charged with his care.

**WHEREFORE,** Plaintiffs **MARISOL LAUREANO, SILVERIO DELRIOS,**

**OLGA DELRIOS** and **VENUS RIVERA,** are entitled to amounts of compensatory and

punitive damages in excess of $25,000 to be determined at trial.

### THIRD CLAIM

77.     Defendants' deliberate individual and collective indifference to plaintiff

Roberto Murray's serious mental illnesses and plaintiffs' obvious need for psychiatric

medication and treatment associated with his serious illnesses, under color of state law,

violated plaintiff Murray's rights guaranteed by the Eighth and Fourteenth Amendment

of the United States Constitution to be free from unusual and cruel punishment.and

caused plaintiff Murray to suffer unbearable mental torture culminating in self inflicted

death.

19

**WHEREFORE,** Plaintiff **ROBERTO MURRAY** is entitled to amounts of compensatory and punitive damages in excess of $25,000 to be determined at trial.

### FORTH CLAIM

78.    Defendants' refusals to respond to plaintiff Murray's known needs for psychiatric medication and treatment for serious mental disorder in violation of the Eighth and Fourteenth Amendment of the United States Constitution caused Plaintiff's family and his mother **ANGELA BRICE** to suffer the loss of support, services and affection of plaintiff Murray along with the emotional pain of having lost a loved one at a young age to an unnecessary death caused by the indifference of the professionals charged with his care.

**WHEREFORE,** Plaintiff **ANGELA BRICE** is entitled to amounts of compensatory and punitive damages in excess of $25,000 to be determined at trial.

### FIFTH CLAIM

77.    Defendant Tamer, Harrsch and Fink's deliberate individual and collective indifference to plaintiff Roberto Murray's life and death medical need for CPR, under color of state law, violated plaintiff Murray's rights guaranteed by the Eighth and Fourteenth Amendment of the United States Constitution to be free from unusual and cruel punishment.and caused plaintiff Murray to slowly die.

**WHEREFORE,** Plaintiff **ROBERTO MURRAY** is entitled to amounts of compensatory and punitive damages in excess of $25,000 to be determined at trial.

### FORTH CLAIM

78.    Defendant Tamer, Harrsch and Fink's refusal to give plaintiff Murray CPR in violation of the Eighth and Fourteenth Amendment of the United States

20

Constitution caused Plaintiff's family and his mother **ANGELA BRICE** to suffer the loss of support, services and affection of plaintiff Murray along with the emotional pain of having lost a loved one at a young age to an unnecessary death caused by the indifference of the professionals charged with his care.

      **WHEREFORE,** Plaintiff **ANGELA BRICE** is entitled to amounts of compensatory and punitive damages in excess of $25,000 to be determined at trial.

**JURY TRIAL DEMANDED**

      Plaintiffs demand a trial by jury.

Dated: New York, New York
       September 29, 2006

EDWARD W. MILLER [EM8489]
Attorney for Plaintiffs Delrios and Murray
575 Lexington Avenue, Suite 2840
New York, N.Y.   10022
Tel: (212) 758-1625